Estate of George Saxe Macdonald, Deceased, Jacob K. Lasser, Executor v. Commissioner.
Estate of George Saxe Macdonald v. Commissioner
Docket No. 25319.
United States Tax Court
1951 Tax Ct. Memo LEXIS 65; 10 T.C.M. (CCH) 1038; T.C.M. (RIA) 51326; October 23, 1951
Harry Silverson, Esq., and Maurice H. Greenberger, Esq., for the petitioner. Scott A. Dahlquist, Esq., for the respondent. DISNEY
Memorandum Findings of Fact and Opinion DISNEY, Judge: This case involves estate tax. A deficiency was determined in the amount of $156,711.69, which has been revised by agreement as to value of certain stock, and will be reflected in computation under Rule 50. The issue presented is whether the Commissioner erred in including in decedent's *66 estate (a) the value of the corpus of a trust created by decedent on December 5, 1941, and (b) the value of corporate stock which was the subject of a contract dated December 19, 1942, between decedent and his grandson, George E. Lockwood, plus certain advances to the grandson. Findings of Fact The facts stipulated by the parties are so found. The petitioner is the duly appointed executor of the Estate of George Saxe Macdonald, Deceased, by virtue of letters testamentary granted him on April 12, 1945, by the Surrogate's Court of the County of Westchester, State of New York. The estate tax return involved herein was filed with the collector of internal revenue for the fourteenth district of New York. The decedent, George Saxe Macdonald, was born on September 10, 1866, and died on March 18, 1945. He executed his last will and testament on October 17, 1944. Decedent was a widower, his wife Mary Macdonald having died intestate on January 6, 1945. Letters of administration for her estate were issued by the Surrogate's Court of the County of Westchester, State of New York, to Fred W. Oberkirch on January 13, 1945. The issue of George and Mary Macdonald are a daughter, Blanche Lockwood, *67 born June 5, 1888, and a son, Allan F. Macdonald, born October 11, 1889. The issue of Blanche Louise Lockwood are a son, George Edward Lockwood, born October 22, 1913, and son, Henry Lockwood, Jr., born December 21, 1915. The issue of Allan F. Macdonald are a son, Allan F. Macdonald, Jr., born March 8, 1918, and a son, Gordon J. Macdonald, born July 22, 1922. By 1918 decedent had built up a successful trade publication business. In that year he retired, at the age of 52. His hobby was boating, and he built a new boat and did some cruising until 1921. In 1921 stock market losses required the decedent to emerge from retirement. He entered the employ of a Mr. Palmer, publisher of the trade magazine "Tobacco." Palmer also owned all the stock of the Lockwood Trade Journal Company, Inc., which published various other trade magazines, including the "Lockwood Trade Paper Journal" and the "Lockwood Directory." [1]
In 1921 decedent entered into a contract with Palmer to purchase "Tobacco," payments to be made out of earnings over an extended period. In 1923 decedent entered *68 into a similar contract with Palmer to purchase all the common stock of the Lockwood Trade Journal Company, Inc. On July 10, 1928, decedent entered into an agreement with Jerome D. Maley and Harriman National Bank. as trustees, to purchase 1,425 shares out of a total of 1,500 outstanding shares of preferred stock of the Lockwood Trade Journal Company, Inc., for $322,250. As specified in the agreement, decedent paid the sum of $62,700 in cash and executed nine "series A" notes for $14,250 each, totaling $128,250; a "series B" note for $80,000; and 54 "series C" notes for $950 each, totaling $51,300. A new stock certificate for 1,425 shares of preferred stock of the Lockwood Trade Journal was issued in the name of George S. Macdonald. Decedent endorsed the certificate in blank and deposited it with the Harriman National Bank as security for final payment for the stock. The series A notes were paid as they became due, except the last three, which fell due, respectively, January 1, 1932, July 1, 1932, and January 1, 1933, and were extended to January 1, 1935, July 1, 1935, and January 1, 1936, respectively. The series B note in the sum of $80,000 was extended to January 1, 1940. Decedent *69 paid all the series C notes on the due dates thereof. During 1928 and 1929 decedent entered into contracts to sell some of the 1,425 shares of said preferred stock as follows: Other
Number
Contracting
of
Date of
Contract
Party
Shares
Contract
Price
Nicholas Volk
71 1/4
July 17, 1928
$10,000
John Banninga
142 1/2
July 17, 1928
20,000
Samuel Mayer
106 7/8
July 17, 1928
15,000
A. S. Zabriskie
71 1/4
July 17, 1928
10,000
Total
391 7/8
55,000
J. K. Lasser
35 5/8
Jan. 2, 1929
5,000
Samuel Mayer
35 5/8
Jan. 2, 1929
5,000
Total
71 1/4
10,000 A separate agreement was entered into by decedent with each of the aforementioned persons covering the number of shares set forth in the aforesaid table. Except for the date of the agreement, the name of the purchaser and the number of shares covered, identical agreements were entered into with each of the other purchasers listed in the aforesaid table. These agreements were made to assist decedent in financing its own purchases. Each such agreement, with the above-mentioned variations, provided in part as follows: "FIRST: Subject always to each and all of the terms and conditions of *70 this agreement and the Maley contract dated July 10, 1928 hereinabove in the preambles hereof referred to, the Purchaser has paid Macdonald at or prior to the execution hereof $20,000.00 in full for 142 1/2 shares of the 1425 shares of the aforesaid preferred stock of the Lockwood Trade Journal Co., Inc. and in consideration of said payment, Macdonald hereby sells and assigns to the Purchaser, the aforesaid number of shares, and agrees to make delivery thereof (a) when the Maley agreement hereinbefore referred to shall have been fully performed by him; or (b) in the event that prior to such full performance by him Macdonald shall have received from said Lockwood Trade Journal Co., Inc. as and for cash dividends and/or cash distributions of said shares, an amount sufficient to paythe aforesaid notes in full with interest as required by the terms of such of said notes as bear interest, then and in any such event Macdonald agrees that notwithstanding the time for delivery fixed by Clause '(a)' of this Article, he will forthwith on the receipt by him of said 1425 shares, deliver to the Purchaser the number of shares together with all increase thereof comprehended by and included in this *71 sale, and hereinabove designated. "SECOND: It is mutually agreed that during the life of this agreement each and all of the said shares of said preferred stock sold to the Purchaser shall remain in the name of Geo. S. Macdonald on the stock books of the corporation and that all cash dividends thereon or cash distributed on account thereof shall accrue to Macdonald and be applied by him to the payment of the notes hereinabove mentioned, inclusive of the interest, if any, thereon, and further: that Macdonald shall possess, and the Purchaser hereby for himself and his heirs, executors, administrators and assigns, hereby grants to Macdonald the right at any time to sell all of said preferred stock; (including any and all stock that may hereafter be received my him as a result of any stock dividend declared by said Lockwood Trade Journal Co., Inc.) at and for such price and upon such terms as he may in his sole and uncontrolled discretion deem suitable, applying the proceeds thereof to the payment of all or any one or more of said notes in accordance with the terms thereof and/or as may be permitted thereby or by the holder thereof; and to exercise, in person or by proxy, all voting *72 rights on any and all shares of stock at any time held by him hereunder, in such manner as he (or his proxy, whenever he shall delegate the power to vote the same to another) shall in his (or his proxy's) sole and uncontrolled discretion deem wise, and to execute as the holder of record thereof all such waivers, consents, legal documents and papers as he may approve, and that said agreement dated July 10, 1928 may permit, for any and all corporate purposes and objects, of whatsoever nature and description, * * *." Until the depression of the early thirties decedent's son-in-law Lockwood (the husband of decedent's daughter Blanche), had been a very prosperous real estate operator. During the depression, however, he suffered severe financial losses. His older son, George Edward Lockwood, was then a student at Cornell University. During the Christmas period in 1933 he informed George that his losses had made it impossible for him to continue to finance George's education. George immediately communicated this information to decedent, with whom he was very close, having always lived near decedent and been a frequent visitor in the latter's home. Decedent agreed to lend George the necessary *73 funds with which to complete his college education. Decedent thereupon prevailed on George to agree to enter decedent's publishing business following graduation from Cornell. He told George that if he would go into the business with him (the decedent) in time, when George became qualified by experience, he (decedent) would turn the business over to George. George understood from this that some day, sooner or later, he would own the business entirely. George did not know whether decedent so understood but thought at the time that decedent so understood. Decedent gave George that impression. In 1933 decedent's only son, Allan F. Macdonald, was established as a civil engineer and was not interested in the publishing business. Decedent's three other grandsons (one a brother of George, and the other two sons of Allan) were then attending grammar school or high school. Due to a rift in the family, starting about 1927 between Allan's wife, Irene, and decedent's wife, the decedent had not for some years seen much of or been very close to Allan's boys. George had always assumed that he would enter his father's business, which had been extremely prosperous prior to the depression. However, *74 after thinking over decedent's offer, George accepted it and so notified decedent. George chose his grandfather's business because it was one which had always been profitable and not subject to fluctuations, prosperity and depression, and because of his definite understanding that the business would be his. Between January 9, 1934 and June 3, 1935, decedent loaned George various sums aggregating $2,472.80 to finance the remainder of his stay in college. These loans, together with others subsequently made, were repaid by George in 1941 and 1942. George was graduated from college in June 1935. In July 1935 he entered the employ of J. K. Lasser & Company, accountants for decedent, to obtain preliminary training for decedent's business. In November 1935 he went to work for the Lockwood Trade Journal Company, Inc.
At that time, and until December 30, 1941, decedent's publishing activities were conducted through three corporations: "(a) Tobacco TradeJournal Company, Inc. (hereinafter referred to as "Tobacco"), with an authorized capital of 10,000 shares of common stock, all issued and outstanding; and "(b) Lockwood Trade Journal Company, Inc. (hereinafter referred to as "Lockwood"), *75 with an authorized capital of 3,000 shares, of which 1,500 shares were preferred stock and 1,500 shares were common stock, all issued and outstanding; and "(c) Macdonald Publishing Company, Inc. (hereinafter referred to as "Macdonald"), with an authorized capital of 350 shares of common stock, all issued and outstanding." Decedent owned 250 shares of Macdonald common stock; the remaining 100 shares were owned by eight to twelve others. All the outstanding shares of Tobacco were owned by Macdonald. 1,050 shares of common stock of Lockwood were owned by Macdonald and the remaining 450 shares were owned by decedent. The majority of the 1,500 shares of preferred stock of Lockwood were owned by decedent; the remaining shares were owned by, or were under contract of sale to, various other inviduals. In 1936 decedent informed George that the holder of 10 shares of Macdonald stock had died. He suggested that George should acquire such shares as a start toward eventually taking over the business. On or about August 28, 1936, decedent loaned George $2,000 with which to purchase the said shares. In 1938 decedent loaned George $3,000 with which to purchase 15 shares of common stock of Macdonald *76 which had become available. In 1939 decedent loaned George $2,725.28, which George used, together with his own funds, to purchase for $3,000 20 shares of common stock of Macdonald which had become available. In 1940 George acquired 25 more shares of common stock of Macdonald for $2,500 of his own funds, paying $1,500 in cash and giving four notes for the balance. In April 1939 decedent's wife purchased for $52,000 (of which $27,000 came from her own funds and $25,000 was borrowed from Lockwood or Tobacco), decedent's $80,000 "Series B" note which he had executed pursuant to the July 10, 1928 agreement with Jerome D. Maley and Harriman National Bank. The purchase was made by Mary Macdonald rather than by decedent because the trustees who then held the note were unwilling to deal with decedent on a discount basis. In January 1940 Mary Macdonald made a gift of the note to decedent, who, in part consideration, assumed her $25,000 indebtedness. Mary Macdonald reported the gift in a gift tax return filed on or about March 14, 1941. The gift was made over the emphatic objection of J. K. Lasser, decedent's tax adviser, who characterized it as a "stupid estate tax plan." The gross estate *77 reported by Mary Macdonald's administrator in her New York estate tax return was $30,739.82, of which $5,121 was accrued income from a trust, hereinafter described, created December 5, 1941. In 1937 George brought up the subject of decedent's performance of his promise made in 1933 to turn the business over to George, at which time decedent had referred to his outstanding indebtedness to the sellers of the Lockwood preferred as a bar to early performance. In May 1939 George was elected a director of Lockwood and again discussed with decedent performance of the promise. Decedent now requested a further delay until he could dispose of the outstanding contracts to sell Lockwood preferred stock to Messrs. Lasser, Mayer and Banninga. On November 4, 1940, decedent delivered to Samuel Mayer 142 1/2 shares of the preferred stock of Lockwood pursuant to the agreements of July 17, 1928, and January 2, 1929. On or about December 6, 1940, decedent delivered to T. R. Lasser, wife of assignee of J. K. Lasser, 35 shares of the preferred stock of Lockwood pursuant to the agreement of January 2, 1929, and repurcased from the said T. R. Lasser 5/8ths of a share of preferred stock of Lockwood. On *78 or about March 1, 1941, decedent delivered to John Banninga 100 shares of the preferred stock of Lockwood pursuant to the agreement of July 17, 1928. Following the delivery of a general release by John Banninga to decedent on or about March 1, 1941, George again questioned decedent about performance of the promise made in 1933. Decedent disclosed for the first time that he had been considering a plan to create a trust of the majority of his holdings in the various companies and to sell the balance of his holdings to George. He told George that he would transfer enough voting stock to the trust to assure the trustees, of whom George would be one, of control of the business, thereby seasoning George to the making of top-level decisions. However, he would hold back enough voting stock so that, upon its sale to George, it would (together with the stock already owned by George, and George's share of the trust corpus upon termination of the trust) give George control individually at that time. Decedent gave George, as reason for setting up the trust, his distress over the rift in the family and his feeling that if he could announce equal treatment by him of his grandsons, Allan's sons *79 would feel more kindly toward him. Later in 1941 decedent mentioned the desirability for income tax purposes, of a dividend being paid to his wife. The idea of establishing a trust had been originally suggested to decedent in the middle of 1940 by his accountant and tax adviser, J. K. Lasser. Lasser's sole purpose was to cause income from the stock placed in trust to be taxed to decedent's wife during the lifetime of both decedent and her. Decedent regarded income taxation as persecution. Discussions of the trust continued between the accountant and decedent until about December 1941. George expressed dissatisfaction with decedent's proposal. He explained that his understanding of the promise made in 1933 was that he would ultimately acquire complete ownership of the business. Decedent denied that such had ever been his intent. George was dissatisfied with the set up. He asked for and decedent granted a raise of salary from $4,000 to $12,000 a year. The increase was effected during the second quarter of 1941 but made retroactive to January 1 of that year. George used the salary increase, together with other funds he had accumulated, substantially to reduce his indebtedness to decedent. *80 Between July 30, 1941, and December 31, 1941, George repaid decedent the sum of $8,000. Decedent also promised George that "if possible he was going to arrange it that none of the stock could be sold to anyone else but me [i.e., George]." During his discussions with decedent concerning the creation of the trust, Lasser had suggested the desirability of consolidating the three publishing companies into one. Decedent considered the suggestion and delayed actual creation of the trust until details of the reorganization could be worked out. Another reason for delay was the consideration by Congress, in July 1941, of an Internal Revenue Code amendment requiring married persons to file joint income tax returns. The enactment of such a provision would have frustrated one of decedent's main reasons for creating a trust, since it would have eliminated the anticipated income tax savings from the division of income with his wife. The suggestion was not safely out of the way until the fall of 1941. After enactment of the Revenue Act of 1941 preparation of the trust instrument was expedited. Decedent asked George to let the sales agreement between him and George wait until the trust had been *81 set up. George reluctantly consented. On December 5, 1941, decedent transferred 900 shares of Lockwood preferred stock, 300 shares of Lockwood common stock and 170 shares of Macdonald capital stock to himself, J. K. Lasser and George Edward Lockwood as trustees, to be held by said trustees pursuant to the terms of an indenture of trust dated December 5, 1941, and executed on that date. On or about March 15, 1942, decedent filed a Federal tax return with the collector of internal revenue at Albany, New York, reporting the said transfer. In such return the Lockwood preferred shares were valued at $60 each and the Lockwood common shares at $20 each as of December 5, 1941. The indenture provided in part: "SECOND: The Trustees shall pay the net income of the said trust as follows: "A. To MARY LOUISE MACDONALD, wife of the Donor, during the life of the Donor. "B. Upon the death of the Donor, the Trustees shall pay "1. Sixty per cent (60%) of the net income of the said trust to the said MARY LOUISE MACDONALD; "2. Twenty per cent (20%) of the net income to BLANCHE MACDONALD LOCKWOOD, daughter of the Donor, if then living. If not then living, to her issue, share and share alike; *82 and "3. Twenty per cent (20%) of the net income to ALLAN FREEMAN MACDONALD, the son of the Donor, if then living. If not then living, to his issue, share and share alike. "C. Upon the death of MARY LOUISE MACDONALD, during the term of the trust, her share of the income shall be divided equally between the Donor's daughter, BLANCHE MACDONALD LOCKWOOD and the Donor's son, ALLAN FREEMAN MACDONALD, if living; if not, to her or his issue, share and share alike. "D. In the event that any of the grandchildren of the Donor who would be entitled to receive any share of the income shall die during the term of this trust, and such grandchild shall leave surviving a wife and issue, then, and in that event, the share of such deceased grandchild shall be divided as follows: One-half to his wife during her lifetime, and upon her death her share of the income shall go to his issue, share and share alike, and the balance of one-half amongst his issue in equal shares. In the event all of the issue shall die leaving the wife surviving, then, and in that event, the income of the issue shall go to the wife. "E. In the event such deceased grandchild shall leave no wife, but shall leave issue, then *83 and in that event, the entire share of the income of said deceased grandchild shall be divided among his issue equally. "F. In the event such deceased grandchild shall leave a wife and no issue, then such wife shall receive the entire share of the income of said deceased grandchild, during her lifetime, and upon her death, her share of the income shall go to the then living grandchildren of the Donor, share and share alike. "G. In the event such deceased grandchild shall leave no wife and no issue, then and in that event the share of the income of such deceased grandchild shall go to all the surviving grandchildren of the Donor in equal shares. "THIRD: Upon the death of both of the Donor's children, BLANCHE MACDONALD LOCKWOOD and ALLAN FREEMAN MACDONALD, this trust shall terminate and the Trustees shall divide the principal as follows: "A. To MARY LOUISE MACDONALD, wife of the Donor, fifty (50) shares of MACDONALD PUBLISHING COMPANY, INC., two hundred fifty (250) shares of LOCKWOOD TRADE JOURNAL COMPANY, INC., Common, and three hundred fifty (350) shares of LOCKWOOD TRADE JOURNAL COMPANY, INC. Preferred. "B. Twenty five per cent (25%) of the balance to each of the four grandsons *84 of the Donor. "C. If the said MARY LOUISE MACDONALD be not living, then her share shall be divided equally among the Donors' grandchildren share and share alike. "D. In the event that any of the grandchildren be not living, and such grandchild shall have left surviving a wife and issue, then and in that event, the share of such deceased grandchild shall be divided as follows: One-half to the wife and the balance of one-half amongst his issue, share and share alike. "E. In the event such deceased grandchild shall leave no wife, but shall leave issue, then and in that event, the entire share of such deceased grandchild shall be divided amongst his issue, share and share alike. "F. In the event such deceased grandchild shall leave a wife and no issue, then such wife shall take the entire share of the said deceased grandchild. "G. In the event such deceased grandchild shall leave no wife nor any issue, then, and in that event, the share of such deceased grandchild shall go to all the surviving grandchildren of the Donor, per capita and not per stirpes." Since decedent and Lasser had already worked out the plan for merging the three companies, article "Tenth" D of the Trust *85 Indenture of December 5, 1941, authorized the trustees to make the necessary exchanges, as follows: "TENTH: The Trustees shall have the following powers and discretions in addition to any conferred by law: * * *
"D. To consent to and participate in dissolutions, re-organizations, consolidations, mergers, sales, leases, mortgages, transfers and other changes affecting securities held by them, and in such connection to delegate their discretionary powers, and to pay assessments, subscriptions and other charges. "1. In the event that during the term of this trust, the Trustees shall vote for the consolidation or merger of TOBACCO TRADE JOURNAL COMPANY, INC., LOCKWOOD TRADE JOURNAL COMPANY, INC. and MACDONALD PUBLISHING COMPANY, INC., the Trustees are directed to vote for such consolidation or merger only on condition that upon completion of the merger or consolidation, the merged or consolidated company will be capitalized with fifteen hundred (1500) shares perferred stock of One Hundred Dollars ($100.00) par value, and eighteen hundred fifty (1850) shares common stock of One Hundred Dollars ($100.00) par value, of which this trust will own nine hundred (900) shares of preferred *86 stock and nine hundred eighty (980) shares of common stock." Article "Ninth" of the Trust Indenture provided: "NINTH: When distribution is made upon termination of this trust, the Trustees, before turning over the stock of the LOCKWOOD TRADE JOURNAL COMPANY, INC. or MACDONALD PUBLISHING COMPANY, INC. to the beneficiaries, shall receive from the said beneficiaries an agreement signed by all of them that they will not sell, pledge or hypothecate any of the stock received by them for a period of five years from the date thereof, unless they first offer the said stock to the remaining beneficiaries at a price to be agreed upon by them, or equal to any price offered in writing by any other individual or corporation." Article "Seventeenth" of the Trust Indenture provided: "SEVENTEENTH: In order to avoid the expense and delay incident to a judicial settlement of the Trustees accounts, the Trustees may, from time to time, render to the Donor an account of their transactions as Trustees. The Donor shall have full power to settle finally any such account and, on the basis of such account, to release the Trustees individually and as Trustees, from all liability, responsibility or accountability *87 for their acts or omissions as Trustees. Such settlement and release by the Donor shall be binding upon all income beneficiaries, remaindermen and other interested parties, even if then under legal disability or not as yet in being, and shall have the force and effect of a final decree, judgment or order of a court of competent jurisdiction rendered in an appropriate action or proceeding for an accounting in which jurisdiction was obtained of all necessary and proper parties. The foregoing provision, however, shall not preclude the Trustees from having their accounts judicially settled if they shall so desire." On December 26, 1941, the stockholders of Macdonald, and on December 28, 1941, the stockholders of Lockwood, approved the terms of a plan of reorganization involving said companies and Tobacco. The effect of the plan was to eliminate Tobacco and Macdonald and to increase the authorized common stock of Lockwood from 1,500 shares to 2,900 shares, of which 1,850 shares were outstanding and the remaining 1,050 shares held in Lockwood's treasury. The necessary certificates were filed in the office of the Secretary of State of New York on December 29 and 30, 1941. At the date *88 of decedent's death the fair market value of the Lockwood shares he had transferred to the trust was $130 per share for the preferred and $100 per share for common stock. After decedent announced the formation of the trust of December 5, 1941, his relations with his grandchildren became better. Following the reorganization the trustees under the indenture of December 5, 1941, received four shares of Lockwood common stock for each share of Macdonald common stock. They therefore held 900 shares of Lockwood preferred stock and 980 shares of Lockwood common stock. From December 5, 1941, to March 18, 1945, the date of decedent's death, the trustees received dividends aggregating $53,671.24 on the shares of Lockwood preferred and common stock. Of this sum all but $1,817 was distributed to decedent's wife (or her estate) as income beneficiary. The Federal income tax returns filed by the decedent's wife for the years 1941 to 1944, inclusive, reveal that, in addition to the income received by her as life beneficiary of the trust of December 5, 1941, the following amounts of gross income were reported by her: Year
Amount
1941
$156.22
1942
136.00
1943
249.78
1944
277.39
*89 The Federal income tax returns of decedent for the years 1941 to 1944, inclusive, reveal that the following amounts of gross income were reported by him: Year
Amount
1941
$34,976.53
1942
33,101.57
1943
33,198.64
1944
33,942.45
Following the creation of the trust, decedent continued to own 550 shares of Lockwood common stock and 250 shares of Lockwood preferred stock. While decedent had told George that, in further performance of his 1933 promise he would sell these remaining shares to George, nothing was done about such sale until after January 1, 1942. The original proposal was that such shares should be sold to George at a price of $60 for the preferred and $20 for the common, with payments to be made by George out of income over a period of eight years. Preparation of the sale contract, however, proved to be a difficult matter. Decedent and George worked on it almost every week end. At no time were the services of an attorney employed. The original draft was very simple. With time and countless redrafts, however, it grew extremely complex. One disputed matter was the period for payment of the purchase price and whether decedent should be compensated *90 for the deferral of payment. George then was subject to draft for military service. Both parties recognized that if he were drafted he would be unable to perform within the agreed eight-year period. It was therefore arranged to extend the period by the length of George's army service, if any, and that no interest should be paid. George also obtained the right to a flat extension of five years, unrelated to any posible military service, provided that he had paid at least one-third of the purchase price at the end of the original period. In return, decedent sought and obtained the right to all dividends during the joint lifetimes of himself and his wife. It was further agreed that if decedent survived his wife, one-half of the dividends (less decedent's income taxes thereon) should be credited to George against the unpaid balance of purchase price; if decedent's wife survived, one-half of the dividends should be paid to her until full payment of the purchase price. Decedent also requested, and obtained, George's permission to include in the agreement only 500 of his 550 shares of Lockwood common and 225 of his 250 shares of Lockwood preferred. He desired to retain the balance for "sentimental *91 reasons," but nevertheless gave George an option to purchase such balance at the contract price. Specific provisions contained in the sale contract include the following.. "This is a contract made this 19th day of December 1942 * * * for the purchase by George Edward Lockwood from George S. Macdonald [of the 500 shares of Lockwood common stock] * * *. "And for the purchase [of the 225 shares of Lockwood preferred] * * *. "Therefore the total cost * * * for the purchase * * * is * * * $33,000. "The terms of payment are to be as follows: "George Edward Lockwood is to pay at the time of signing this agreement * * * $2,801.92 * * *. * * *
"The certificates of stock for both the five hundred (500) shares of common and the two hundred and twenty-five (225) shares of preferred stock of the Lockwood Trade Journal Co., Inc. shall be signed by George S. Macdonald transferring the title to them to George Edward Lockwood, but shall not be transferred in the stock register of the Lockwood Trade Journal Co., Inc. until payment is made in full and George S. Macdonald shall continue to receive the dividends on said five hundred (500) shares of common and two hundred and twenty-five *92 (225) shares of preferred stock of the Lockwood Trade Journal Co., Inc. during his lifetime and the lifetime of his wife, Mary L. Macdonald. Said George S. Macdonald and/or Mary L. Macdonald shall pay the Federal and States taxes thereon. "If George S. Macdonald survives Mary L. Macdonald one-half the net proceeds of said dividends, after the payment of taxes thereon, shall be credited to George Edward Lockwood or his estate, against the balance remaining unpaid; and if Mary L. Macdonald survives George S. Macdonald one-half of said dividends shall be paid to Mary L. Macdonald during her lifetime, up until the the time the total debt has been paid. "George S. Macdonald in selling the above shares * * * has retained ownership of fifty (50) shares of common and twenty-five (25) shares of preferred * * * and grants * * * an option whereby George Edward Lockwood may purchase * * * the said remaining * * * shares * * *. * * *
"A copy of this contract shall be attached to the certificates of stock referred to in this contract and all are to remain in the possession of George S. Macdonald, although he may at his will and discretion at any time during the life of George S. Macdonald *93 turn them over to George Edward Lockwood. They are not to be transferred on the books of the company during the lifetime of George S. Macdonald, who retains the right to vote all the stock referred to in this contract, unless George S. Macdonald shall be declared incompetent because of a stroke or any other cause which would prevent him from properly functioning. In such an event, the stock is to be transferred to George Edward Lockwood or his estate; but the proceeds from dividends shall continue to go to George S. Macdonald or Mary L. Macdonald as hereintofore provided. "Should the Lockwood Trade Journal Co., Inc. fail or go out of business for any cause during the life of this agreement which means until the payment of the final balance of the debt, any remainder due on the debt shall be cancelled and shall not be a charge against George Edward Lockwood, or his estate. * * *
"None of the stock referred to in this contract is to be sold or transferred by George Edward Lockwood or his estate but is to be held therein to be turned over by George Edward Lockwood or his estate in the proportions provided for in the will of George Edward Lockwood to his wife Katherine Morris *94 Lockwood and his children by her, excepting that if the children are still minors it would go into their possession when they have reached the legal age. In the event that George Edward Lockwood fails to leave a will then these said certificates of stock, eight hundred (800) shares in all, are to go one-third to his wife, Katherine Morris Lockwood, and the remaining two-thirds to his children; or if George Edward Lockwood leaves a will making any other distribution of the proportionate part of the stock to go to his wife, Katherine Morris Lockwood, and his children, he has the privilege of leaving it all to his wife in trust for her lifetime; the stock to be distributed to his children after the demise of Katherine Morris Lockwood. "The purpose of this is that these eight hundred (800) shares of stock in the Lockwood Trade Journal Co., Inc. is to remain in the possession of George Edward Lockwood during his lifetime and to go to his estate on his demise and from his estate to his present wife and his children." Formal execution of the contract also was deferred by a dispute over price. Decedent was so pleased at the favorable reaction of the Macdonald family to the announcement *95 of the trust that he feared jeopardizing the restored harmony should they learn about the sale to George. He therefore wished to placate them by leaning over backwards in fixing the price which George was to pay, and receded from the $60- $20 set-up already agreed to. The impasse was broken by an agreement to wait notification of the Bureau's action as to the values at which the Lockwood shares had been reported in decedent's 1941 gift tax return. On December 19, 1942, George and the decedent arrived at substantial agreement as to the provisions of the contract. Accordingly, though the contract was not then signed, George paid decedent $5,000, of which $2,198.08 was applied in satisfaction of his existing indebtedness to decedent and the balance of $2,801.92 was treated as a payment on account of the purchase price of the shares. By letter dated June 30, 1943, the Commissioner of Internal Revenue notified decedent that the reported values of $60 for the preferred and $20 for the common were acceptable. Decedent, however, still entertained his fears that a sale to George at the $60- $20 figures might reopen the breach with his son's family. He therefore insisted that the price should *96 be $80 for the preferred and $30 for the common. George, in turn, refused to "pay that extra for good will which was not coming to me." After considerable negotiation decedent and George arrived at a compromise solution whereby the price was raised to $80- $30, with the stipulation that if the purchase was not consummated by the time of decedent's death, the price for all the shares was to be reduced to $60 for the preferred and $20 for the common. Decedent consented, stating that he did not care what people thought of him after he died. The agreement was signed in the fall of 1943 but was dated as of December 19, 1942, when George had made his initial payment and substantial understanding had been reached. The following table shows various financial data, as of December 31 of each year, as indicated, for Lockwood Trade Journal Company: Liabilities
Net profit
other than
Net profit
after
capital
Capital
Net
before Federal
Federal
Total
stock
stock
earnings
Year
income taxes
income taxes
assets
and surplus
and surplus
1938-1942
1933
$ 27,008.89
$ 21,730.56
$574,874.46
$10,000.00
$564,874.46
1934
25,684.26
22,601.45
589,809.85
18,001.97
571,807.88
1935
26,812.12
23,269.88
502,325.55
14,429.52
487,896.03
1936
36,563.46
32,071.42
504,291.66
14,448.74
489,842.92
1937
38,634.79
34,273.34
515,780.41
17,751.14
498,029.27
1938
20,740.10
15,672.96
516,393.43
16,717.51
499,675.92
$15,672.96
1939
24,987.15
21,937.08
544,143.03
37,549.43
506,593.60
21,937.00
1940
31,379.55
26,776.53
528,150.81
20,758.12
507,392.69
26,776.53
1941
38,088.61
32,114.90
517,836.44
10,060.66
507,775.78
32,114.90
1942
40,479.86
32,320.10
537,346.83
23,850.95
513,495.88
32,320.10
1943
45,402.47
31,160.41
546,223.84
26,369.77
519,854.07
1944
95,160.38
77,355.03
574,498.70
9,228.75
565,269.95
1945
90,115.45
32,728.65
570,877.35
7,804.00
563,073.35
1946
147,542.84
89,530.94
593,458.29
8,359.00
585,099.29
1947
113,125.83
53,540.79
599,305.08
10,915.00
588,390.08
1948
158,026.01
111,315.67
643,646.65
8,460.90
635,185.75
1949
45,691.36
14,550.43
609,871.42
7,365.20
602,506.22
Average
$25,764.31
*97 Per cent
of net
Dividends
paid in
paid
dividends
Year
1938-1942
1938-1942
1933
1934
1935
1936
1937
1938
$14,625.00
93.3
1939
14,800.00
67.8
1940
28,750.00
107.4
1941
25,750.00
80.0
1942
24,950.00
77.2
1943
1944
1945
1946
1947
1948
1949
Average
85.14
The figures as to profit, assets and liabilities for years prior to 1942 are after giving effect to merger. As of December 31, 1942, Lockwood's balance sheet showed good will per books, after merger, in the amount of $502,376.81. Following is a summary of the earnings per share of preferred and common stock of Lockwood for the year 1942 and the average for the years 1938-1942, inclusive: 1942
1938-42 Av.
Earnings available
$32,320.00
$25,764.00
Pfd. div. requirements (1,500 shs.)
12,000.00
12,000.00
Balance
$20,320.00
$13,764.00
Common dividend requirements (1,850 shs.)
14,800.00
14,800.00
Balance for Surplus or for Preferred-Common participation
$ 5,520.00
($ 1,036.00)
Def.
Times Pfd. dividend rate earned
2.69
2.15
Earnings applicable per Pfd. share
9.65
8.00
Earnings rate per Com. share
10.97
7.44
Earnings applicable per Com. share
9.65
7.44
Dividends Paid: Preferred ( $8 per share)
12,000.00
12,000.00
Common
12,950.00
9,775.00
"per share
7.00
5.28
*98 On December 19, 1942, the fair market value of Lockwood stock in blocks of 550 shares of common and 250 shares of preferred was $20 per share for common and $60 for preferred. The common stock of Lockwood carried voting control (unless and until a default in payment of preferred dividends). On December 5, 1941, George owned 70 shares of Macdonald for which he later received 280 shares of Lockwood in the reorganization. Under the trust indenture of December 5, 1941, he was ultimately entitled to receive 245 shares of Lockwood common if decedent's wife failed to survive the measuring lives, or 132 1/2 share of Lockwood common if decedent's wife survived both measuring lives. Following decedent's death, his son's branch of the family sought independent legal advice as to whether the sale of decedent's shares to George pursuant to the December 19, 1942, contract was bona fide. After studying the contract counsel advised that in their opinion, "the agreement is a valid contract, duly executed, for the sale by George S. Macdonald to George Edward Lockwood of the shares of stock of the Lockwood Trade Journal Company, Inc. covered thereby." On or about December 29, 1943, George paid *99 to decedent the sum of $5,240.32 on account of the purchase price of the stock covered by the contract of December 19, 1942. On December 27, 1944, George paid to decedent the additional sum of $4,614.10 under the contract. On October 8, 1945, George paid to the estate of decedent $13,343.66, representing the balance of the purchase price due under the contract. By an instrument bearing date of December 19, 1942, George Lockwood, in writing, addressed to decedent, elected to take up the option to purchase the 50 shares of common and 25 shares of preferred of Lockwood for a total price of $3,500 (at the rate of $80 a share for preferred and $30 a share for common) at any time after one-third of the purchase price of 500 shares of common and 225 shares of preferred of Lockwood had been paid, but not before the death of decedent; and decedent, in writing, agreed to the terms of the option. On a paper headed "Account between George S. Macdonald and George Edward Lockwood," listing items of advances from decedent to George starting on January 9, 1934, and including 17 items entitled "College Loan," repayments by George Lockwood of a total of $18,528.32, and a balance of $24,957.76 on December 29, 1943, and *100 signed by decedent, there is listed under date of December 19, 1942, under the advancement column an item of $15,000 explained as 500 shares of Lockwood common stock and an item of $18,000 explained as 225 shares of Lockwood preferred. Thereon decedent acknowledges receipt of the payments shown on the paper. Up to about November 1943 decedent was an active vigorous man. As late as the summer of 1943 he actively engaged in his favorite sports of fishing and boating. Decedent commuted to work regularly until about the middle of 1942, when his wife was injured in an accidental fall. Decedent was concerned about her condition and began to take care of her himself. Consequently, he thereafter came to his office only about three days a week. While at home, however, he kept in constant touch with his office. In the late fall of 1942 he caught a severe cold which weakened him to a point where Dr. Chapman, his wife's doctor, advised him to go away for a rest or stop working for a week or so. Decedent explained that he could not go away but agreed to Dr. Chapman's suggestion that "as a compromise he enter the New Rochelle Hospital." Decedent entered New Rochelle Hospital on December 21, 1942, and *101 remained until his discharge on January 1, 1943. Dr. Chapman died during that period. While in the hospital, decedent was X-rayed and given extensive gastrointestinal, blood, urine and heart examinations. This was the first time decedent had ever been hospitalized. After Dr. Chapman's death decedent was treated by Dr. Eugene Morrison. Decedent visited Dr. Morrison's office once or twice a month, principally for tonic injections. Decedent resumed his former activities, including personal care of his wife. One day during this period he climbed two flights of stairs to his ration board, complaining thereafter that he had suffered shortness of breath. During the summer of 1943 he took an active part in framing a schedule of increased advertising rates for his publications and a letter of explanation therefor to advertisers. Dr. Morrison retired from practice in October 1943. He was succeeded as decedent's physician by Dr. Hilmert Ranges. Decedent went to Dr. Ranges on November 4, 1943, complaining of a sudden stomach pain with which he had been seized that morning while driving his car to the railroad station en route to his office. Dr. Ranges advised immediate hospitalization. Decedent *102 was admitted to the New Rochelle Hospital on November 4, 1943, and remained there under Dr. Ranges' care until his discharge on December 9, 1943, when his symptoms subsided. During his stay in the hospital decedent was frequently visited by members of his family and business associates. He told George that he thought he was being confined by reason of a general run-down condition. Decedent kept an accurate "log," setting forth in detail the events of each day. The log was used by Dr. Ranges to ascertain what happened between visits. Decedent did not make any subjective notes. Petitioner was put in the hospital in November 1943 because at that time he had signs of heart failure or congested heart failure. Petitioner had had a sudden onset of severe pain in his chest and he was hospitalized because of the possibility of his having suffered a coronary thrombosis. It was because of that diagnosis by Dr. Ranges that he was placed in the hospital. After his discharge from the hospital on December 9, 1943, decedent was advised to stay at home, although not necessarily in bed, for about two weeks. In January or February 1944, Dr. Ranges told him that he could go back to work. Thereafter *103 decedent attended business with some regularity until the winter of 1944. He went to his office two days a week; more often when necessary. When at home he was in constant touch with the office by telephone. In addition, he saw George daily and other business associates at frequent intervals. No important business decisions were made without his participation and he insisted on being consulted on even minor matters, "from buying of a pencil on up * * *." In March 1944, he took an active part in settling a dispute regarding printing costs. In November 1944, Dr. Ranges again recommended hospitalization. Decedent was admitted to the New Rochelle Hospital on November 5, 1944. At that time he stated to the admitting physician that he had "to previous hospital entries for gastritis and 'general run-down condition' in the past two years. No other serious illness or surgery." The report of the admitting physician states: "A 78-year old white male who had symptoms of diminished cardiac reserve for the past year and who has had progressive shortness of breath and increasing edema for the last two weeks in spite of digitalis and mercupurin. Patient has had two previous hospital admissions *104 for bronchial infections and symptoms of mild congestive failure." Decedent remained in the hospital until January 12, 1945, when he was discharged for further care at home. During this third stay at the hospital, decedent remained in constant touch with his office by telephone. Many of his associates visited him. On November 10, 1944, at a stockholders' meeting of Lockwood held in his hospital room, decedent was reelected a director. At a directors' meeting held in his hospital room immediately thereafter, decedent was reelected president and other officers were elected. There was a further meeting with decedent in his hospital room late in December 1944 at which the effect of the excess profits tax on the company's dividend policy was considered and the amount of the dividend determined. Decedent was mentally alert until shortly before his death. Until the month of his death he personally checked the payroll deductions made from his salary checks. The immediate cause of decedent's death was "congestive heart failure, due to arteriosclerotic heart disease." Decedent may have been suffering from the disease for several years without any awareness of being ill. The condition *105 was not curable but was not necessarily fatal within a short period; decedent could have lived with it for another five or ten years. Dr. Hilmert Ranges furnished the following information in reply to a questionnaire which he received from the Treasury Department some time in 1947 and which was dated by him May 12, 1947. Dr. Ranges found that in November 1943 when he first attended the decedent the malady from which decedent was suffering was arteriosclerotic heart disease. The treatment as prescribed by Dr. Ranges was described as digitalis with restricted activity. In response to the second question which was: "How long, according to your diagnosis or information had the decedent been so afflicted?" - the answer given was "About five years." According to the Doctor's determination that five years dated from November 1943, it might even have gone back beyond five years from that date. The decedent's disease was progressive. The determination that the decedent had been suffering from a heart condition was based upon the X-ray of his heart, his blood pressure and on his general condition, i.e., on the objective findings rather than on anything that the decedent had told the doctor. *106 In the Doctor's opinion the disease from which the decedent suffered was not curable but a slowly progressive condition which could go on for many years. The decedent was treated regularly by Dr. Ranges from November 1943 until his death in March of 1945. With respect to the decedent's condition, Dr. Ranges found that his condition became steadily worse but he was able to be "around" until near the end. Decedent suffered from high blood pressure, coronary artery disease and cardiac disease according to Dr. Ranges' own records and the records of the hospital. The certificate of death covering decedent which was signed by Dr. Ranges on March 18, 1945, shows that the immediate cause of death was congestive heart failure and that there had been a duration of that condition for a period of five months due to arteriosclerotic heart disease of four years and five months. Dr. Ranges told decedent that he had a heart condition. Decedent never indicated to his grandson, George, anticipation of death until about two days before his death. He never discussed death with his accountant. Dr. Ranges found him mentally alert until shortly before death, and decedent did not ask him anything about *107 life expectancy or indicate to him apprehension of death. As late as 1942 he discussed with his accountant, and as late as 1943 he discussed with his business associates, the advisability of acquiring new publications. Immediately after the sale, in 1942 or early 1943, of his 62 foot boat the "Mary Mac," which was necessitated by wartime restrictions on its use, he planned to build a new and larger boat. He labored continuously and hard at the actual preparation of elaborate plans for this new boat until his last hospitalization in November 1944. As late as January 1945 he was in constant communication with his accountants and tax advisers as to income tax consequences of various transactions and as to all types of possible savings, even minor ones. As late as March 3, 1945, he executed a declaration of estimated tax for 1945, declaring that his income would be the same as it had been in 1944. In 1940 when he insisted on having his wife give him his $80,000 note which she had purchased, despite his tax adviser's objection to the consequent increase of his taxable estate, he refused to talk to his accountant about estate taxes, and repeated that he was not going to be worried about *108 it. His accountant could not reconcile the difference in decedent's attitude toward estate taxes and income taxes. The magazine "Paper Trade Journal" of which the decedent was the publisher, contained an article in its issue of March 22, 1945, with respect to the death of the decedent from which the following paragraph is extracted: "Mr. Macdonald first began to show signs of failing health several years ago when he suffered a mild stroke which slightly impaired the vision in one of his eyes. He began to rearrange his affairs at that time, shifting many responsibilities to the shoulders of younger men with the view of providing for the continuation of his publishing business without serious interruption regardless of whatever eventualities might occur. However, Mr. Macdonald, although he spent several rather lengthy periods in the hospital and was bed ridden at his home for several weeks previous to his death, kept in close touch with his business affairs up until the time of his death. He may thus literally be said to have died in harness which is undoubtedly as he would have it." On February 16, 1940, the decedent executed a Last Will and Testament which was duly witnessed *109 by Theodore I. Watterson and Edward P. Murray. Among other provisions contained in the Will is paragraph Fifth, which reads as follows: "FIFTH: All the rest, residue, and remainder of my property and estate, both real and personal, and wheresoever situate, which at the time of my death shall belong to me or be subject to my disposal by will, I give, devise and bequeath to the trustees hereinafter named in trust, nevertheless, during the lives of my daughter, BLANCHE MACDONALD LOCKWOOD, and my son, ALLAN FREEMAN MACDONALD, to invest the same and to keep the same invested, and to receive the rents, issues, income and profits therefrom, and after defraying all taxes and other lawful charges upon the same, to pay monthly sixty percentum (60%) of the net income thereof to my beloved wife, MARY LOUISE MACDONALD, twenty percentum (20%) of the net income thereof to my daughter, BLANCHE MACDONALD LOCKWOOD, and twenty percentum (20%) of the net income thereof to my son, ALLAN FREEMAN MACDONALD. In the event that my beloved wife, MARY LOUISE MACDONALD, predeceases my daughter, BLANCHE MACDONALD LOCKWOOD, and my son, ALLAN FREEMAN MACDONALD, I direct my trustees to pay the net income monthly *110 as follows: Thirty-five percentum (35%) to my daughter, BLANCHE MACDONALD LOCKWOOD, thirty-five percentum (35%) to my son, ALLAN FREEMAN MACDONALD, seven and one-half percentum (7 1/2%) to my grandson, GEORGE EDWARD LOCKWOOD, seven and one-half percentum (7 1/2%) to my grandson, HENRY AUGUSTUS LOCKWOOD, JR., seven and one-half percentum (7 1/2%) to my grandson, ALLAN FREEMAN MACDONALD, JR., and seven and one-half percentum (7 1/2%) to my grandson, GORDON JOY MACDONALD. In the event that my daughter, BLANCHE MACDONALD LOCKWOOD, shall die during the life of this trust, her share of the income is to be divided among her issue. In the event that my son, ALLAN FREEMAN MACDONALD, shall die during the life of this trust, his share of the income is to be divided among his issue. Upon the death of any grandchild, his share of the income is to be divided share and share alike among his lawfully wedded wife and his issue. If any of my grandchildren dies leaving no lawfully wedded wife or issue, his share of the income shall be divided equally among my other grandchildren or their respective wives and issue." The stock which was transferred by the decedent to the trust on December 5, 1941, and *111 which was reported on a gift tax return for the calendar year 1941 was the first gift ever reported by decedent. The Commissioner in determining deficiency included in decedent's gross estate the 250 shares of Lockwood preferred stock, at $195.96 a share, and the 550 shares of Lockwood common at $186.16 a share, and $10,486.08 advances by decedent, all totaling $161,864.08, less $23,142.42 "payments on account," leaving $138,721.66. He also included in gross estate $358,800.80 for the 980 shares of common and 900 shares of preferred stock in Lockwood, placed in trust on December 5, 1941. The transfer of property in trust by decedent on December 5, 1941, was not a transfer in contemplation of, or to take effect at, his death. Opinion We first take up the question as to whether there should be included in decedent's gross estate the value of the shares subject to the contract between decedent and his grandson, George E. Lockwood, of date, December 19, 1942. In that connection the respondent, both in the deficiency notice and upon brief, asks inclusion in gross estate of $10,486.08, advances by decedent to George E. Lockwood. However, the matter is merely referred to and not *112 argued, and an examination of the facts reveals that the $10,486.08 had by George E. Lockwood been paid to decedent prior to his death. This is affirmatively shown by a receipt signed by the decedent acknowledging payment of the amount and other amounts as of prior to December 29, 1943. Obviously, therefore, the amount was in the decedent's estate in cash and presumably so far as shown by the record before us has already been taken into consideration in evaluating his assets. No issue in that regard appears to survive here. We therefore pass from the point. Under a contract actually executed in the fall of 1943, but dated December 19, 1942, at which date George E. Lockwood paid decedent $2,801.92 on the contract, the decedent and his grandson entered into an agreement of sale of 500 shares of common stock and 225 shares of preferred stock, of Lockwood Trade Journal Company, also into a contract of option for the purchase by the grandson of 50 shares of common and 25 shares of preferred stock in Lockwood. Although the respondent contends that the whole contract was one of option, the face of the contract shows definitely that it is a contract for purchase as to the 500 shares of common *113 and 225 shares of preferred, for a total price of $33,000, and providing and reciting payment of the $2,801.92 on December 19, 1942, as part payment on the $33,000 and providing for the payment of the balance thereof by George E. Lockwood or his estate. The obligation upon George E. Lockwood or his estate to pay the $33,000 (less half the net proceeds of dividends, after taxes paid on the stock, after decedent's death) was absolute except that in case Lockwood should fail or go out of business any remainder then due under the debt should be canceled and except that upon decedent's death a lesser price should prevail. The contract, inter alia, refers to the purchase and to the fact that decedent "in selling the above shares" had retained ownership of the 50 shares of common and 25 shares of preferred, as to which the option is granted. We hold that except as to such option shares the contract was one of sale. However, we think it is immaterial as to whether the contract was optional or not. The petitioner's prime contention is that by virtue of the contract the decedent received an adequate and full consideration in money or money's worth, in the course of a bona fide sale, within the *114 language of section 811(c) of the Internal Revenue Code, and that therefore the value of the stock is not includible in decedent's gross estate. He points out that the estate tax regulations, Regulations 105, Section 81.17, specifically except from transfers intended to take effect in enjoyment at or after death, such a bona fide sale for adequate and full consideration. The same language appears in both sections 811(c) and 811(d), and it is upon these sections that the respondent on brief depends, arguing that possession, title and control of the stock, and the right to dividends remained with the decedent; also that, Lockwood being prevented from disposing of the stock which must go to his wife and children upon his death, the contract was in the nature of a substitute for testamentary disposition. If in fact, as petitioner contends, the contract represented a transfer of stock bona fide and for adequate and full consideration, within the exception in the statute, it is obvious that the respondent's view can not prevail. After careful analysis of all of the evidence before us we can not but be of the opinion that there was such bona fide sale for adequate and *115 full consideration. We recently in Estate of John M. Goetchius, 17 T.C. - (No. 54, promulgated September 28, 1951) stated, in substance, that the exemption from estate tax was limited to transfers where the transferor received benefit in full consideration in a genuine arm's length transaction. We think the transaction here was of that nature. The decedent and his grandson haggled over the matter a great deal over an extended period, and even after everything else was agreed upon could not agree on the price to be paid for the stock. The grandson was taking the view that he carried out an old contract with his grandfather and had a right to the stock, whereas the grandfather was forcing him to pay for it. We see in all of the circumstances surrounding the transactions, and perhaps most particularly in the care with which the decedent opposed his grandson's contentions, the opposite of any donative intent and the affirmation of good faith arm's length dealing. The decedent contrary to the contentions of his grandson finally succeeded in keeping the right to the dividends and the right to vote the stock as well as the actual possession of the stock, though the certificates were "signed *116 by George S. Macdonald transferring the title to them to George Edward Lockwood" in the language of the contract, though not to be transferred in the stock register until payment is made in full, and though decedent was to receive the dividends during the life of himself and wife. This is the negation of intent to make gratuitous transfer and the elements of reservation of right to vote the stock divident, right to dividends, and that the stock be not transferred on the stock register until paid for, appear plainly as mere contractual arrangements arrived at by compromise between parties acting at arm's length and without donative intent. It has been often held that even in case of an option for the sale of property, that if the contract is real only the option price and not the actual value is to be used for estate tax purposes. In Wilson v. Bowers, 57 Fed. (2d) 682, there was an option contract giving a right to purchase stock at a specified price on the owner's death and it was held that for inheritance taxation the option price must control. The basic reason is succinctly stated, in substance, that the contract was enforceable against the decedent or his estate. In *117 Edith M. Bensel et al., Executors, 36 B.T.A. 246, the decedent, in order to satisfy a son's demands and retain his services (though he was estranged from the son), gave him an option to purchase corporate stock at his death. At his death the son exercised the option and bought the stock. We held that the excess over option price was improperly included in gross estate. We held not only that the consideration was adequate and full in money or money's worth but that it must be measured at the time the contract was entered into rather than the time the option was exercised, at the decedent's death. Here, too, it is clear that the decedent was actuated, in entering into the contract, by the contentions of his grandson and that he did not deal other than at arm's length with him. He made the matter one of sale, not gift. The Bensel case is peculiarly applicable. The contract was enforceable against decedent's estate. In Helen S. Delone, 6 T.C. 1188, we held in an income tax case that an enforceable option determines the value of stock so encumbered. In May et al., Executors v. McGowan, 97 Fed. Supp. 326, an estate tax case, the court held, following *118 Wilson v. Bowers, supra, and Lomb v. Sugden, 82 Fed. (2d) 166, that where decedent and his son had agreed that at the death of either the other should have an option to purchase his stock at a certain price, the value for estate tax purposes could not exceed that price. Lomb v. Sugden, supra, holds that for Federal estate tax purposes an enforceable option to purchase decedent's stock limited the value for Federal estate tax purposes to the contract price. To the same effect see Estate of John T. H. Mitchell, 37 B.T.A. 1. The ratio decidendi involved in these cases is in effect that since the decedent had entered in good faith into a contract at arm's length, his estate when he died included not the value of the property but the value of the property as affected by the contract, that is, the value set in the agreement involved. Here the value set was paid, before and after decedent's death, to him or his estate. Therefore, Estate of Spiegel v. Commissioner, 335 U.S. 701, relied upon by the respondent, does not here apply. That case in no wise considered the effect of the exception in section 811(c) and (d) as to bona *119 fide sale for an adequate and full consideration or the question of effect of such contract upon the value of property therein involved. Under the above cases, since we have concluded that the contract here was at arm's length and without donative intent, we consider as in the same class all of the stock covered by the contract dated December 19, 1942, both the 725 shares thereby sold and the 75 shares thereby subjected to option. Though our conclusion above, that there was arm's length transaction and bona fide sale for adequate and full consideration, eliminates objections based upon section 811(c) and (d), because of the exception, in case of such bona fide sale, stated in both subsections, we note particularly in that connection that the provision in the contracts that at the date of decedent's death the price of the stock should be reduced, is clearly a provision within section 811(c) and subject to the exception as to bona fide sale. The provision in the contract for such reduction in price of stock was moreover, under the evidence, a matter of haggling between the parties and of compromise between the grandson's idea that the lower price should have been provided from the beginning, *120 and the decedent's insistence on the higher figure, until the agreement for reduction in case of death. This was of the essence of the arm's length transaction. This was no transfer in contemplation of death. In connection with this issue the respondent contends that the contract though dated December 19, 1942, was not actually executed until about December 1943 and that the latter date is, therefore, the crucial one; also that the latter date being within two years prior to decedent's death there is under section 811(c) presumption that it was made in contemplation of death. Since we have concluded that this was not a transfer in contemplation of death, and the two year rule as to presumption is stated in the statute to cover only contemplation of death, the presumption rule does not apply. We consider that the petitioner in any event has shown that it was not in contemplation of death. In our view, December 19, 1942, is the crucial date. The grandson on that date paid $2,801.92 and the matter was kept open only because of the inability to agree on price. The "account between George S. Macdonald and George Edward Lockwood," signed by decedent, lists the transaction under date *121 of December 19, 1942. The parties, during decedent's lifetime, plainly considered the matter as one of transfer on that date. We so regard it. After considering all of the facts of record before us, we conclude and hold that the contract was not in contemplation of death or otherwise within the transfers covered by section 811(c) or (d) but was a bona fide sale for adequate and full consideration in money or money's worth and that the Commissioner erred in including in decedent's gross estate the value of the stock thereof at the date of death. We next consider whether the inter vivos trust created on December 5, 1941, was in contemplation of death within the intendment of section 811(c). Inasmuch as it was irrevocable and the respondent's brief on this issue devotes itself entirely to the consideration of contemplation of death, although he does state that the property is includible under both section 811(c) and (d), we consider section 811(d) and any element of section 811(c) except contemplation of death, as not involved here. Moreover, the facts proven on this issue, so limit it. Did the decedent contemplate death in creating the trust, on December 5, 1941? The petitioner's *122 contention may be summarized as one that the trust was not in contemplation of death because its object was to take care of decedent's problem as to his grandson George's claims upon decedent's business, to heal a rift in the family by making similar provisions for both George and his other grandsons, and treating his two children and grandchildren alike, and the desire to save income taxes by making the income taxable to decedent's wife who had little other income, whereas decedent's income was large. The petitioner points out also that the trust was suggested not by the decedent but by his accountant-tax adviser; also that contemplation of death is refuted by the fact that decedent caused his wife to transfer the $80,000 note to him despite the fact that his accountant objected, calling the move stupid from an estate tax standpoint. The respondent points out that the trust was set up when the decedent was a little over 75 years of age; that he had not made a practice of making gifts to the members of his family, his gift tax return showing the trust also showing that there had been no previous gifts; that the trust was a substitute for testamentary disposition because the decedent *123 had executed a will on February 16, 1940, in which he devised and bequeathed the residue of his estate in trust during the lives of his daughter and son and provided for income to them in equal amounts, and that he did the same in the trust; that the decedent's physical condition at the time of the creation of the trust indicates contemplation of death by him; that the saving of income tax was slight in comparison with the saving of estate tax; and that the petitioner's argument as to decedent's attempt to heal the rift in the family is met by the fact that he had made the same provisions in his will, in general, for the family. With reference to the contention that income tax saving and not estate tax evasion was decedent's object, respondent cites Estate of Jacob Gidwitz, 14 T.C. 1263, quoting that case to show dependence therein upon Igleheart v. Commissioner, 77 Fed. (2d) 704; Oliver v. Bell, 103 Fed. (2d) 760; and Allen v. Trust Co. of Georgia, 326 U.S. 630. The evidence on this matter of contemplation of death is voluminous and both the petitioner and the respondent are supported in their contentions by no inconsiderable proof. *124 The decision on the point has not been easy. We have set forth the evidence in considerable detail in our findings and have weighed and considered it with care. We think it unnecessary to repeat such evidence here. After much consideration, we have concluded that the dominant motive of the decedent in the execution of the trust was not contemplation of death. He was aged and his physical condition, though the evidence is somewhat confused, was not good. Yet the evidence indicates that the decedent was, in setting up the trust, not considering his physical condition or the likelihood of death within the test set down by United States v. Wells, 283 U.S. 102. Though his will executed on February 16, 1940, did provide for his family in a manner considerably similar to that set out in the trust, we think that it does not demonstrate that the dominant motive of the decedent was testamentary. The cases relied upon in this respect by the respondent are by no means similar in fact to the instant matter. In general, we think it may soundly be said that the cases on this subject are to the effect that if will and trust are essentially parts of the same transaction the trust is indicated *125 to be testamentary, particularly if similar provisions are contained. In the Gidwitz case though the trust was dated December 30, 1936, and the will November 3, 1936, the will was drawn at the same time as decedent was consulting the attorney who drew it, about the trust. The Igleheart case involves a trust and will both of the same date. In Oliver v. Bell the decedent was more than 97 years of age when the will and trust were drawn within two days of each other. Allen v. Trust Co. of Georgia involved no will and the property was held not includible in gross estate. Here, though there is some indication that the trust was suggested by the accountant as early as the middle of 1940, it was not decided upon by the decedent until much later and executed December 5, 1941, whereas the will was executed in February, 1940. Other than the similarity of important provisions, no connection between will and trust appears. Indeed, the fact that the will set up in large part the same provisions as the trust later set up indicates that to that extent at least the trust was not necessary as a testamentary matter, for without it the will had already provided much the same. There is illogic in the contention *126 that a will similar to a trust but considerably earlier and not in effect a part of the same transaction, indicates testamentary intent in the latter, for the latter would be unnecessary in that respect. Instead, the will having taken care of the decedent's testamentary intent and of the intended beneficiaries, after his death, setting up of the trust would appear to be motivated by considerations of life rather than death. At least it so indicates, in our view, under the other evidence before us here. The respondent's idea that the rift in the family was cured equally by will and trust overlooks the fact that the trust and the announcement as to it had a tendency to cure the rift during the decedent's lifetime, whereas the will would be effective only at death and, of course, was essentially subject to change. The trust was irrevocable. We can not overlook the fact that the decedent appears as interested in what his family thought, during his lifetime, but indifferent to their views after his death. The history of the decedent's business relations with, and promises to, his grandson over a period of years, and the grandson's repeated efforts to work the matter out, seem to us also *127 to offer reasonable explanation for the creation of the trust. It did to a considerable extent resolve such matters. We have before us also the fact that the trust idea was originated not by the decedent but by his accountant-tax adviser. This has been held to be material and we consider it so here, under all the circumstances. As to saving in income taxes relied upon by the petitioner, it is true, as the respondent points out, that the amount saved is small in comparison with the estate tax involved; yet we would be disregarding completely evidence which stands very largely uncontradicted, if we failed to find that this decedent had an income-tax persecution complex, and no such view toward estate taxes. He had taken into his estate $80,000 from a note, against the strong advice of his accountant that it was, estate-tax-wise, a stupid thing to do. His wife had little income. Decedent appears as a largely self-centered person, more concerned with his relations in life than what was thought of him later. After weighing all of the evidence, we have concluded and we hold that contemplation of death was not the dominant motive of the decedent in setting up the trust but rather that it *128 was related to matters involving his own life and those of his family. We, therefore, hold that the trust was not executed in contemplation of death. Because of concessions made, on matters not necessary to discuss, Decision will be entered under Rule 50. Footnotes
1. The similarity of the names of these publications and of decedent's daughter's family is purely coincidental.↩